*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HIGGINS LAKE.

---

ROSCOMMON COUNTY and CRAWFORD COUNTY,

      Petitioners-Appellees/Cross-Appellees,

v

CHARLENE CORNELL, GREG SEMACK, WAYNE BROOKS, BRUCE CARLETON, and HIGGINS LAKE PROPERTY OWNERS ASSOCIATION,

      Respondents-Appellants,

and

JAMES DOUGLAS BROWN, JR., MELANIE NORMA BROWN, CHARLES WAYNE BROOKS, S. CURTIS DEVOE, CAROLYN T. DEVOE, BRUCE N. CORNETT, SALLY J. CORNETT, RICK CASSIDAY, CHARLOTTE CASSIDAY, KATHLEEN M. TROCK, Trustee of the KATHLEEN M. TROCK TRUST, CHARLES N. DEWEY, JR., MARK E. O'BRIEN, WILLIAM A. CORNELL, JR., CRAIG M. SABLE, MELISSA J. SEITZ, Trustee of the MELISSA JEAN SEITZ TRUST, JAMES PAUL SEITZ, SAM M. MIGLIORE, TAMMY H. MIGLIORE, ROBERT FRYE and LYNNE FRYE, Trustees of the ROBERT AND LYNNE FRYE TRUST, ANN M. QUINN, B. CALVIN PHILIPS, DENNIS WOOD, FREDERICK G. KRAUSS, JOHN F. TOWNSEND III, DONALD RAY HEYS, STEVEN L. RICKETTS, FRANK

FOR PUBLICATION
December 15, 2025
8:35 AM

No. 367805
Roscommon Circuit Court
LC No. 2023-726443-CZ

-1-

ARAGONA, Manager of ARAGONA FAMILY,
LLC, DONALD LOUIS BRYANT, WYNN ANN
DRAPER-BRYANT, and WILLIAM D.
ISENSTEIN,

        Cross-Appellants.

Before: K. F. KELLY, P.J., and MALDONADO and MARIANI, JJ.

K. F. KELLY, P.J.

In this case involving the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq*., respondents[1] appeal by right the circuit court's order establishing and confirming the boundaries of a special assessment district surrounding Higgins Lake. Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case involves properties surrounding Higgins Lake, which is located in Roscommon County and Crawford County, Michigan. Respondents are owners of various properties that surround Higgins Lake and are leaders in the Higgins Lake Property Owners Association. In December 2022, recognizing that there were no records confirming that a special assessment district had ever been formally established to allow the county to levy assessments against properties for the costs of maintaining the level of Higgins Lake, the Roscommon County Board of Commissioners adopted a resolution directing counsel to begin court proceedings to establish a special assessment district for Higgins Lake. In January 2023, the Crawford County Board of Commissioners adopted a similar resolution.

The Board of Commissioners for each respective county named "the Roscommon County Administrator/Controller" as their "delegated authority" and approved $10,000 for the level of Higgins Lake, which included establishing and confirming the special assessment district. Roscommon County hired an engineering firm, Spicer Group, Inc. ("Spicer Group"), to prepare a recommendation for the boundaries of the special assessment district. In the process of determining which properties fell within the special assessment district, Roscommon County voluntarily held meetings to receive community input, and Spicer Group created a map depicting the tentative recommended special assessment district boundaries. In total, 2,019 properties were included in the recommended special assessment district.

In June 2023, petitioners filed a petition in the circuit court to establish a special assessment district for Higgins Lake and confirm the special assessment district boundaries on the basis of the Spicer Group's recommendation. Roscommon County noted that the boundaries were subject to slight changes "based on further input from property owners and stakeholders," and that

---

[1] Cross-appellants concur with the brief filed by respondents. For ease of reference, this opinion will refer to respondents and cross-appellants collectively as "respondents."

"landowners within the final recommended special assessment district boundaries will be notified of the hearing as required" under MCL 324.30707.

The circuit court scheduled a hearing on September 15, 2023, "to receive evidence for establishing and confirming the boundaries of a lake level special assessment district for Higgins Lake, consistent with the provisions of MCL 324.30707." The court ordered petitioners to provide notice of the hearing by publication within each of the respective counties and to provide notice to the property owners within the proposed special assessment district by first-class mail.

In response to members of the public seeking further information regarding the process of including their properties in the special assessment district, petitioners submitted a brief in support of their petition, arguing that "Part 307"[2] required the circuit court to "confirm the boundaries of a special assessment district when determined by the Counties that a special assessment district shall be formed but allows the Court to confirm what properties should be included in the boundaries based upon whether the properties benefit from the legal levels of Higgins Lake." While noting that the circuit court was required to confirm the special assessment district boundaries within 60 days after a lake's level was determined, petitioners contended that this 60-day period did not prevent a court from acting after that period had expired. Petitioners also maintained that the counties were empowered to determine the costs and methodology of potential assessment amounts; and this was not for the circuit court to determine when confirming the special assessment district boundaries. Costs and methodology were, therefore, to be determined *after* the boundaries were confirmed, and that process was subject to its own statutory requirements.

Respondents objected to the petition, arguing that it failed to meet statutory and constitutional requirements, and requested that the court dismiss the petition. Respondents argued that the petition was untimely because special assessment district boundaries must be confirmed within 60 days of the determination of a lake level, and the level for Higgins Lake was last determined in 2009. Respondents further argued that petitioners were required to establish a "defined project" and explain what the special assessment district would pay for before it was established, which petitioners failed to do, in violation of the statute. Because there was no specified project or known cost, respondents could not determine "whether the benefit from the improvement has been fairly allocated to the properties within the proposed district," as required under Michigan law. Accordingly, respondents asserted that it would be a violation of their due-process rights to establish a special assessment district without a specified project or cost. Finally, respondents argued that petitioners failed to provide information about what the amount assessed from the special assessment district would be and how it would be apportioned.

The circuit court held the hearing on the petition on September 15, 2023. Addressing respondents' objections, the court stated:

> So, in my interpretation of the statute, there's a fundamental misunderstanding about what this statute means. There's two parts: First, is establishing the boundaries of a special assessment district which is why we're here

---

[2] Part 307 is entitled "Inland Lake Levels" and begins at MCL 324.30701.

today. Once that's done, if the county decides to go forward with the special assessment and assessing a tax with regard to . . . a project in that special assessment, then an apportionment roll needs to be done; [f]urther hearings have to be held in that regard but that's not why we're here today. And so, my reading of the objection placed today is, in that regard, premature.

The court also rejected respondents' argument that there was a 60-day limitations period for a special assessment district to be confirmed and determined that the court was not precluded from considering a special assessment district after the period had passed.

The circuit court explained that the purpose of the hearing was to apprise "the public of the governmental action while providing the opportunity to present opposing viewpoints." The court stated that the hearing was "required by statute" and "not a trial." The hearing's focus was "not about potential assessment costs, methodology to be used in maintaining a lake level, or any dam structure cost related to maintaining the lake level, or additional structure and/or improvements if any, the lake level itself, or whether that legal lake level should be amended in any way." The court explained that the special assessment district proceedings involved two phases: (1) setting the boundary, and (2) establishing a "special assessment tax," which included "an apportionment study" and "cost benefit analysis." The court clarified that the instant proceeding was phase one, and that the time and place for examining the amount to be assessed would come in phase two.

Luke O'Brien, an engineer from Spicer Group, was qualified as an expert. He testified "how the recommendation of the special assessment district was determined," which involved including properties with either "direct" (i.e., lakefront) access, or "indirect" access through other means, such as an easement. O'Brien confirmed that he was never asked to calculate any costs of any specific project in relation to the special assessment district boundaries, and he would not be providing any testimony about costs or apportionment. Various unrepresented individuals questioned O'Brien about certain aspects of the proposed special assessment district and placed objections to the petition on the record, many of which had to do with being taxed or assessed. The circuit court reiterated that its role was "very limited," that the hearing was only about boundaries, and that the court had "no role in assessing the tax" and was "not part of that process at all."

After reciting and interpreting several operative NREPA provisions at the end of the hearing, the circuit court confirmed the special assessment district and its boundaries, subject to some amendments made at the hearing. The court granted petitioners' proposed order and entered an order confirming the special assessment district boundaries the same day.

This appeal followed.

## II. STANDARDS OF REVIEW

The issues raised by respondents' appeal relate to the circuit court's interpretation of various statutory provisions and not to the special assessment district boundaries themselves. Moreover, respondents' issues on appeal do not oppose petitioners for selecting improper properties or using an improper methodology in that regard. Instead, respondents challenge the circuit court's establishment of the special assessment district and confirmation of its boundaries

because the court's action was untimely and did not consider the project, costs, proportionality, or apportionment, arguments which implicate statutory interpretation.

This Court reviews de novo matters of statutory interpretation. *McQueer v Perfect Fence Co*, 502 Mich 276, 285-286; 917 NW2d 584 (2018). "All matters of statutory interpretation begin with an examination of the language of the statute." *Id*.at 286. If a statute is unambiguous, it "must be applied as written." *Id*. (quotation marks and citation omitted). This Court may not read something into the statute "that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Id*. (quotation marks and citation omitted). Furthermore, statutory language "cannot be viewed in isolation, but must be construed in accordance with the surrounding text and the statutory scheme." *Id*. (quotation marks and citation omitted). In other words, a statute must be read as a whole. *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009). "Courts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146; 644 NW2d 715 (2002). Finally, courts "give undefined statutory terms their plain and ordinary meanings." *Id*.

Constitutional questions are reviewed de novo. *Scots Ventures, Inc v Hayes Twp*, 212 Mich App 530, 532; 537 NW2d 610 (1995). However, in the circuit court, respondents never argued that Part 307 was unconstitutional, and this issue is unpreserved. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289; 14 NW3d 472 (2023). "If a litigant does not raise an issue in the trial court, this Court has no obligation to consider the issue." *Id*. Nonetheless, this Court may address an unpreserved issue "if the failure to consider the issue would result in manifest injustice, if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented." *Id*. at 289-290 (quotation marks and citation omitted).

III. ANALYSIS

Respondents argue that the circuit court erred by entering an order establishing a special assessment district and confirming its boundaries because (1) the boundaries were required to be confirmed within 60 days of a lake-level determination, (2) the lack of a defined project rendered the special assessment district premature and prevented the court from determining the assessment's proportionality and apportionment, and (3) Part 307 is unconstitutional. We conclude that the circuit court did not err by establishing the special assessment district and confirming its boundaries.

A. FRAMEWORK OF NREPA

Under NREPA, a county board is authorized to take actions to determine a lake's normal water level via its own motion or a petition by a required number of landowners. MCL 324.30702(1). The county board is empowered to delegate the powers of performing such actions to the county commissioner "or other delegated authority." MCL 324.30702(2). Before doing so, the county board may decide to conduct a "preliminary study" by an engineer. MCL 324.30703(1). This study includes the costs of any project to establish and maintain a lake's normal level. MCL 324.30703(2)(a). In their brief, respondents emphasize this preliminary study and frame this as a study that a county must conduct, which is in line with their position that the project and costs

must be established prior to the establishment of the special assessment district. However, this preliminary study is not mandatory, see MCL 324.30703(1), and while it may help inform what special assessment district, if any, might be necessary in setting a lake's normal level, see MCL 324.30703(2)(f), the statute does not provide that it must always be performed when establishing a special assessment district.

If the county board determines, on the basis of that study, that a lake's normal level should be established, it may "initiate a proceeding by proper petition in the court of that county for determination of the normal level for that inland lake and for establishing a special assessment district if the county board determines by resolution that one is necessary as provided in [MCL 324.30711]." MCL 324.30704(1). "Upon filing of a civil action under this part, the court shall set a day for a hearing." MCL 324.30707(1). Notice shall be provided via publication, MCL 324.30707(1), and first-class mail, MCL 324.30707(2).

The circuit court must consider various factors when determining a lake's level. MCL 324.30707(4)(a) to (j). The circuit court is empowered to determine a lake's normal level, and it maintains continuing jurisdiction. MCL 324.30707(5). "If a court-determined normal level is established pursuant to this part, the delegated authority of the county or counties in which the lake is located shall maintain that normal level." MCL 324.30702(3). See also MCL 324.30708(1) ("After the court determines the normal level of an inland lake in a proceeding initiated by the county, the delegated authority of any county or counties in which the inland lake is located shall provide for and maintain that normal level.").

The heart of this issue is MCL 324.30711(1)[3]:

[t]he county board may determine by resolution that the whole or a part of the cost of a project to establish and maintain a normal level for an inland lake shall be defrayed by special assessments against the following that are benefited by the project: privately owned parcels of land, political subdivisions of the state, and state owned lands under the jurisdiction and control of the department. If the county board determines that a special assessment district is to be established, the delegated authority shall compute the cost of the project and prepare a special assessment roll.

"The court shall confirm the special assessment district boundaries within 60 days following the lake level determination." MCL 324.30707(5).

MCL 324.30712(1) governs how to compute "the cost of a normal level project." This computation must include nine factors, see MCL 324.30712(1)(a) to (i), such as the costs of "[e]stablishing a special assessment district, including preparation of assessment rolls and levying assessments," MCL 324.30712(1)(c), and costs associated with "works of improvement necessary for maintaining the normal level," MCL 324.30712(1)(e). "The delegated authority may add as a

---

[3] MCL 324.30711 was amended by 2024 PA 112, effective April 2, 2025. The changes are not substantive and do not impact the issues raised on appeal.

cost not more than 15% of the sum calculated under subsection (1) to cover contingent expenses." MCL 324.30712(2).

"A special assessment roll shall describe the parcels of land to be assessed, the name of the owner of each parcel, if known, and the dollar amount of the assessment against each parcel." MCL 324.30714(1). "The delegated authority shall set a time and place for a public hearing or hearings on the project cost and the special assessment roll," MCL 324.30714(2), and notice must be provided both by publication, see MCL 324.30714(2)(a), and "[a]s provided in Act No. 162 of the Public Acts of 1962, being sections 211.741 to 211.746 of the Michigan Compiled Laws," MCL 324.30714(2)(b). "At or after a public hearing, the delegated authority may approve or revise the cost of the project or the special assessment roll. Before construction of a project is begun, the county board shall approve the cost and the special assessment roll by resolution." MCL 324.30714(3). The finalized special assessment roll "shall be final and conclusive unless appealed in a court within 15 days after county board approval." MCL 324.30714(4).

"[D]ecisions made by municipalities with respect to special assessments generally should be upheld," but an appellate court "will intervene where there is a substantial or unreasonable disproportionality between the amount assessed and the value which accrues to the land as a result of the improvements." *Dixon Rd Group v Novi*, 426 Mich 390, 403; 395 NW2d 211 (1986).

> Special assessments are presumed valid. . . . "[A] special assessment will be declared invalid only when the party challenging the assessment demonstrates that 'there is a substantial or unreasonable disproportionality between the amount assessed and the value which accrues to the land as a result of the improvements.' " If there is not a proportionate relationship, then the special assessment would be "akin to the taking of property without due process of law." [*Kane v Williamstown Twp*, 301 Mich App 582, 586; 836 NW2d 868 (2013) (citations omitted; alteration in original).]

Simply put, a special assessment is "valid if it meets two requirements: (1) the improvement subject to the special assessment must confer a benefit on the assessed property and not just the community as a whole and (2) the amount of the special assessment must be reasonably proportionate to the benefit derived from the improvement." *Michigan's Adventure, Inc v Dalton Twp*, 290 Mich App 328, 335; 802 NW2d 353 (2010).

## B. SPECIAL ASSESSMENT DISTRICTS

Petitioners argue, and the circuit court concluded, that Part 307's procedure for special assessments is bifurcated into two stages. First, the special assessment district and confirmation of its boundaries must be established. Second, the special assessment tax against the properties within that district must be levied. Under this framework, the legal principles surrounding a special assessment tax, such as proportionality and apportionment, relate to the second stage, not the first. In contrast, respondents contend that the two stages described by petitioners and the circuit court are in fact combined into one stage. Therefore, in order for a special assessment district to be created and its boundaries confirmed, a court is required to assess proportionality, apportionment, and benefit incurred at the outset. This necessarily requires that a project be identified along with

its estimated costs. There is no dispute that petitioners have yet to identify such a project or its costs, and the circuit court explicitly stated that it was not addressing such matters.

Here, the operative statute is MCL 324.30711(1):

The county board may determine by resolution that the whole or a part of the cost of a project to establish and maintain a normal level for an inland lake shall be defrayed by special assessments against the following that are benefited by the project: privately owned parcels of land, political subdivisions of the state, and state owned lands under the jurisdiction and control of the department.

This first sentence of MCL 324.30711 gives the county board the discretion to determine by resolution that part or all of a project's cost for establishing and maintaining a lake's normal level will be paid by special assessment against the specified properties and entities that would benefit from the project. However, nothing requires the county board to identify a specific project and its costs before the creation or confirmation of boundaries. Rather, this provision merely provides authority for county boards to use special assessments to help establish or maintain lake levels.

The second sentence provides that "[i]f the county board determines that a special assessment district is to be established, the delegated authority shall compute the cost of the project and prepare a special assessment roll." MCL 324.30711(1). Thus, there is a two-step process: (1) a determination that a special assessment district should be established; and then (2) a computation of the project's cost and preparation of the assessment roll. In other words, it is only if the county board determines that a special assessment district is to be established that the delegated authority is subsequently required to compute the cost of the project and prepare a special assessment roll. The second step necessarily requires a specific project be identified along with its costs, but the first step does not. A county board can determine that a special assessment district should be established to help pay for maintaining a lake's level without knowing the specifics of what the project will be or its associated costs. As with the first sentence, nothing within this second sentence mandates a county board to identify a specific project and calculate its costs prior to establishing the district and confirming its boundaries.

This interpretation comports with other provisions within Part 307, which provides a detailed process for determining a project's costs and preparing the special assessment roll. See MCL 324.30712; MCL 324.30714. Conspicuously absent, however, is any similar process for confirming the boundaries of a special assessment district. MCL 324.30707(5) summarily provides without further requirement that "[t]he court shall confirm the special assessment district boundaries within 60 days following the lake level determination." No other step or process is discussed within Part 307, and this absence appears to be intentional. If the Legislature desired to require county boards to identify a project and its costs at the outset and prior to confirmation of the boundaries, it could have explicitly stated so, either in MCL 324.30711 or elsewhere. There is no such language. Instead, the Legislature gave county boards discretion to determine that a special assessment district is required to help pay for the costs of maintaining lake levels. See MCL 324.30711(1). Circuit courts have continuing jurisdiction to address such matters, and, once the county board resolves to establish the special assessment district, the circuit court must confirm its boundaries. See MCL 324.30707(5). Respondents' position essentially reads in an additional requirement where no such language exists.

This two-step process also comports with Part 307's notice requirements. MCL 324.30707(1) requires that "[u]pon filing of a civil action under this part, the court shall set a day for a hearing"; moreover, the counties (or other delineated entities) must provide notice of the hearing via publication in a newspaper of "general circulation" within the county or counties in which the lake sits for three consecutive weeks prior to the hearing. Additionally, MCL 324.30707(2) requires that notice also be provided via first-class mail "at least 3 weeks prior to the date set for the hearing to each person whose name appears upon the latest city or township tax assessment roll as owning land within a tentative special assessment district at the address shown on the roll . . . ." Consistent with these requirements, the circuit court ordered that notice of the hearing be provided by newspaper three consecutive weeks prior to the hearing and by first-class mail. In contrast, MCL 324.30714, which governs how a special assessment roll is to be prepared, requires a different type of notice separate from MCL 324.30707(1) and (2). See MCL 324.30714(2)(a) and (b). The different notices are delineated by the Legislature.

There is no language in MCL 324.30711(1) providing for the establishment of the special assessment district boundaries; in fact, there is no language whatsoever involving boundaries. Rather, the statute authorizes the county board to resolve to establish a special assessment district; if it makes such a determination, it shall compute the project's costs and prepare the special assessment roll. MCL 324.30711(1). The word "shall" is mandatory. *True Care Physical Therapy, PLLC v Auto Club Group Ins Co*, 347 Mich App 168, 182-183; 14 NW3d 456 (2023). Thus, once a county board resolves to establish a special assessment district, it must begin to compute the project's costs and prepare the special assessment roll. Moreover, MCL 324.30714(1) mandates that "[a] special assessment roll shall describe the parcels of land to be assessed, the name of the owner of each parcel, if known, and the dollar amount of the assessment against each parcel."

However, there is no explicit language requiring that a specific project be identified and its costs calculated prior to establishment of a special assessment district and confirmation of its boundaries. Respondents cite MCL 41.724(1) and (2), which are outside Part 307, but apart from a cursory cite, respondents provide no other discussion of or context for this provision. It is true that these provisions suggest that a project and its cost must be identified prior to establishing a special assessment district. See MCL 41.724(1) ("If the township board desires to proceed with the improvement, the township board shall tentatively declare by resolution its intention to make the improvement and tentatively designate the special assessment district against which the cost of the improvement or a designated part of the improvement is to be assessed."); MCL 41.724(2) ("The notice shall state that the plans and estimates are on file with the township clerk for public examination and shall contain a description of the proposed special assessment district."). This statute, however, is contained within the context of public improvements by townships, and does not concern inland lake levels and county boards. Given that Part 307 was explicitly created by the Legislature to govern inland lake levels and associated special assessment districts, MCL 41.724 is not persuasive authority. Respondents have provided no analysis showing how, or even why, this provision should be applied to inland lake levels. See *Bill & Dena Brown Trust v Garcia*, 312 Mich App 684, 695; 880 NW2d 269 (2015).

Accordingly, respondents' concerns regarding proportionality and apportionment are premature for purposes of this appeal. As the circuit court correctly recognized, such matters would only come into play in this case after the special assessment district has been established

and its boundaries are confirmed. The requirements for computing a project's costs and preparing the special assessment roll in MCL 324.30712 and MCL 324.30714 may become an issue if and when petitioners determine to proceed with levying the special assessment tax against the district, but they lie beyond the proper scope of what was before the circuit court below and what is before us now.

## C. TIMELINESS OF PETITION

Respondents also contend that the circuit court erred because petitioners were required to bring their petition within 60 days after the lake level was established, which they contend occurred in 2009 at the latest. We disagree.

As previously discussed, NREPA governs the determination of lake levels.[4] Under MCL 324.30707(5):

> The court shall determine the normal level to be established and maintained, shall have continuing jurisdiction, and may provide for departure from the normal level as necessary to accomplish the purposes of this part. The court shall confirm the special assessment district boundaries within 60 days following the lake level determination. The court may determine that the normal level shall vary seasonally.

On the one hand, the statute uses the word "shall," which is mandatory. *True Care Physical Therapy, PLLC*, 347 Mich App at 182-183. However, reading this provision as a whole, this 60-day period is a requirement placed upon the circuit court to perform a particular action rather than a limitation upon its authority. The statute directs the circuit court that it must confirm the special assessment district within 60 days after a lake level has been determined. There is no express language within MCL 324.30707(5) precluding the circuit court from confirming the special assessment district boundaries after those 60 days have passed. See *People v Yarema*, 208 Mich App 54, 57; 527 NW2d 27 (1994) (stating that "the fundamental rules of statutory construction generally preclude construction of a time limit for performance of an official duty as being mandatory, absent language that expressly precludes performance of such duty after the specified time has elapsed. Such statutes are normally construed as being 'directory.' In this context, the term 'directory' means something less than the alternative of compliance or absolute dismissal.").

Relying on *Yarema*, this Court previously addressed and rejected respondents' argument. *In re Determination & Establishment of a Lake Level for the Waters of Stylus Lake*, unpublished memorandum opinion of the Court of Appeals, issued November 18, 2003 (Docket No. 242302), p 2.[5] In that case, the circuit court set Stylus Lake's normal level in May 2000, and the drain commissioner filed a petition in November 2001 to establish the special assessment district

---

[4] See, e.g., MCL 324.30702(1); MCL 324.30704(1).

[5] Unpublished decisions of this Court are not binding but may be considered for their persuasiveness. *Eddington v Torrez*, 311 Mich App 198, 203; 874 NW2d 394 (2015).

boundaries. *Id*. at 1. The circuit court denied the petition as untimely but confirmed the boundaries on reconsideration. *Id*. The respondents appealed, arguing that the 60-day period within MCL 324.30707(5) barred the petition as untimely. See *id*. at 1-2. This Court disagreed, explaining that "the language of the statute does not preclude the court from acting after the sixty days have passed and provides for the continuing jurisdiction of the circuit court." *Id.* at 2.

In *Stylus Lake*, this Court quoted directly from *Yarema*, reasoning that "[t]he fundamental rules of statutory construction generally preclude construction of a time limit for performance of an official duty as being mandatory, absent language that expressly precludes performance of such duty after the specified time has elapsed." *Stylus Lake*, unpub op at 2, quoting *Yarema*, 208 Mich App at 57 (quotation marks omitted). Instead, statutes involving such time limits "are normally construed as being 'directory.' " *Stylus Lake*, unpub op at 2, quoting *Yarema*, 208 Mich App at 57 (quotation marks omitted).

We find *Stylus Lake* persuasive and in line with the plain language of the statute and we adopt its reasoning. MCL 324.30707(5) directs the circuit court to perform an official duty, i.e., confirming the special assessment district boundaries, and does not contain express language precluding the court from performing that duty if the 60 days are past. This comports with the other language within that same provision providing the court with continuing jurisdiction. See MCL 324.30707(5). By providing the court with continuing jurisdiction, the court necessarily has authority to address the maintenance of a lake's level. Counties are required to maintain lake levels, see MCL 324.30702(3); MCL 324.30708(1), and a special assessment district is one method by which that lake's level can be maintained, see MCL 324.307011(1).

In support of their argument, respondents cite MCL 324.30711(1), and point to the language that "[t]he county board may determine by resolution that the whole or a part of the cost of a project to establish and maintain a normal level for an inland lake shall be defrayed by special assessments," MCL 324.30711(1), arguing that the word "and" mandates that petitioners must seek to both establish and maintain a lake level. Given that petitioners sought only to maintain a lake level, not establish or change it, respondents therefore contend that a special assessment district was unavailable to them. However, this argument does not relate simply to timeliness but, rather, to the ability of petitioner to file the petition in the first place.

"As this Court has previously recognized, the words 'and' and 'or' are not interchangeable and their strict meaning should be followed when their accurate reading does not render the sense dubious and there is no clear legislative intent to have the words or clauses read in the conjunctive." *Coalition Protecting Auto No-Fault v Mich Catastrophic Claims Ass'n*, 317 Mich App 1, 14; 894 NW2d 758 (2016). While true that the conjunctive "and" typically means "a merging of two distinct requirements" rather than "a choice or alternative between two or more things," respondents' interpretation would "render the sense dubious and there is no clear legislative intent to have the words or clauses read in the conjunctive." *Id*. (quotation marks and citation omitted).

As previously discussed, Part 307 clearly requires that once a lake level is established, it must be maintained, and the circuit court retains continuing jurisdiction over the matter. See MCL 324.30702(3); MCL 324.30707(5); MCL 324.30708(1). Read within this context, the language respondents latch onto merely comports with this mandate. Higgins Lake's level was first established in 1926, before being modified in 1982, in 2009, and again in 2012. Petitioners in the

present case, as "counties in which the lake is located," MCL 324.30702(3), were required by law to maintain this level. One method of doing so was through a special assessment district. See MCL 324.307011(1).

This Court previously rejected a somewhat similar argument within the context of the Inland Lake Level Act of 1961 (ILLA).[6] See *In re Van Ettan Lake*, 149 Mich App 517, 521-524; 386 NW2d 572 (1986). In that case, the lake's normal level was originally set in the 1940s and 1950s. See *id*. at 519-520. Although the petitioner sought to determine the lake's normal level as well as to create a special assessment district, the petitioner agreed to the same lake levels as set in prior court orders. See *id*. As explained by this Court:

> It is true that petitioner's complaint set forth height and level determinations identical to those already in place under the 1944 and 1957 orders. It is also true that the petitioner's complaint does not indicate the need for any new construction. We think it evident that the sole purpose of this proceeding is to change the source of financing for the Van Ettan Lake dam [i.e., to create a special assessment district]. [*Id*. at 522.]

The respondents "argue[d] that because the county did not petition for a change in the normal height and water level of Van Ettan Lake, as previously determined by the circuit court under the statute in effect prior to 1961, the circuit court was without authority in 1983 to change the method of financing maintenance of the existing dam," i.e., to confirm the creation of a special assessment district. *Id*. at 521. This Court disagreed:

> Respondents have failed to persuade us, however, that the county's purpose in instituting this proceeding is contrary to the authority granted it under the Inland Lake Level Act. There is no express language in the statute limiting the authority of the circuit court to confirm special assessment districts only where there is a change in the lake level or only where a new structure is required for maintenance of the same level. [*Id*. at 522.]

This Court held that the "Inland Lake Level Act of 1961 authorizes the creation of a special assessment district, so long as the creation of the district is preceded by a determination of the normal lake level." *Id*. at 524.

*Van Ettan* also demonstrates that the phrase "establish and maintain" contained within MCL 324.30711(1) does not require a county to petition both to establish and maintain a lake's level in order to allow for the creation of a special assessment district. So long as the special assessment district is preceded by a determination of the lake's level, the district can be established even if the county is only seeking to maintain a lake's level. This comports with the purpose of Part 307, as evidenced by its plain language, of requiring counties to maintain lake levels once

---

[6] "The ILLA . . . was repealed in 1994 and reenacted without substantive change as Part 307 of the Natural Resource Environmental Protection Act in 1995," *In re Project Cost & Special Assessment Roll for Chappel Dam*, 282 Mich App 142, 145 n 1; 762 NW2d 192 (2009), which makes caselaw interpreting such prior provisions useful for interpreting Part 307 of NREPA.

they are established.  Here, as previously discussed, there was already a prior determination of Higgins Lake's level.  Accordingly, similar to *Van Ettan*, the creation of the special assessment district was valid because it was preceded by a determination of a normal lake level.

## D.  DUE PROCESS

Lastly, petitioners argue that due process required that the circuit court address respondents' objections to the lack of proportionality and apportionment.  We disagree.

As an initial matter, we conclude that respondents have abandoned this issue for failing to adequately brief it.  *Seifeddine v Jaber*, 327 Mich App 514; 519-520; 934 NW2d 64 (2019).  Respondents fail to set forth the applicable legal principles, and it is unclear what type of constitutional challenge—facial or as-applied—respondents assert.  In addition to their failure to properly frame their constitutional challenge, respondents fail to present sufficient substantive argument.  They summarily contend that if this Court interprets Part 307 as the circuit court did, Part 307 must be unconstitutional because it provides "no opportunity for affected property owners to judicially pre-challenge proportionality and apportionment, before implementation . . . ."  This Court is left to speculate what respondents mean by a "judicial pre-challenge" and how this makes the entirety of Part 307 unconstitutional.  "An appellant may not merely announce his or her position and leave it to this Court to discover and rationalize the basis for his or her claims."  *Bill & Dena Brown Trust*, 312 Mich App at 695 (quotation marks and citation omitted).

Even if not abandoned, however, we find no merit in respondents' argument.  The Due Process Clauses of both the United States and Michigan Constitutions guarantee a defendant receive due process of law.  US Const, Am XIV; Const 1963, art 1, § 17.  Generally, "[t]he guarantee of procedural due process requires 'notice and an opportunity to be heard' prior to a deprivation of life, liberty, or property."  *Cary Investments, LLC v Mount Pleasant*, 342 Mich App 304, 315; 994 NW2d 802 (2022) (citation omitted).  "But all that is required before deprivation of a property interest 'is that the procedures at issue be tailored to the capacities and circumstances of those who are to be heard to ensure that they are given a meaningful opportunity to present their case[.]' "  *Id*. (quotation marks and citation omitted; alteration in original).

"The right to due process of law is a flexible concept and must be analyzed by considering the particular circumstances presented in a given situation."  *In re Project Cost & Special Assessment Roll for Chappel Dam*, 282 Mich App 142, 150; 762 NW2d 192 (2009).  Part 307 provides a number of notice requirements prior to a lake level's determination or the approval of a special assessment roll.  See MCL 324.30707(1) and (2); MCL 324.30714(2).  Individuals are also permitted to appeal the finalized special assessment roll to the circuit court.  MCL 324.30714(4).  This Court previously held that the notice procedures within MCL 324.30714 satisfied due process.  See *Chappel Dam*, 282 Mich App at 150-151.

As previously discussed, this case involved the establishment of a special assessment district and confirmation of its boundaries.  There is no special assessment tax involved; there is only a special assessment district.  Accordingly, respondents' concerns over a special assessment tax and new financial obligations are premature in the context of this appeal.  And as to the establishment of the district and confirmation of its boundaries, the circuit court ordered that notice of the hearing on those matters be provided both by newspaper three consecutive weeks prior to

-13-

the hearing and by first-class mail. Respondents have never contested such notice. Petitioners put in place a mechanism for receiving public input, including surveys and meetings. Respondents were able to be present at the hearing, to present objections, and to question O'Brien. Accordingly, respondents were kept apprised, consulted throughout the process, and provided a meaningful opportunity to present their case. See *Cary Investments*, 342 Mich App at 315.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Allie Greenleaf Maldonado
/s/ Philip P. Mariani